ORIGINAL

FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

OCT 2 3 2014

JAMES N. HATTEN, Clerk
By: _____
Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

COLLETTE KEETON,

                Plaintiff,

v.

MICHAEL THURMOND,
Superintendent of DeKalb County
School District, et al.,

                Defendants.

**CIVIL ACTION FILE NO.
1:14-cv-2330-SCJ**

**JURY TRIAL DEMANDED**

### FIRST AMENDED COMPLAINT

    **COLLETTE KEETON**, a *Pro Se* litigant files her **FIRST
AMENDED COMPLAINT**, and alleges:

### JURISDICTION

### FEDERAL QUESTION JURISDICTION

    1.    Jurisdiction over this action is conferred on this Court
under 28 U.S.C. § 1331 in that Keeton's claims arise under a federal
statute, *i.e.* § 504, and under 28 U.S.C. §§ 1343(3) and (4) in that this
is an action (1) arising under the laws of the United States, and (2) to

recover damages under an Act of Congress providing for the Protection of Civil Rights.

### SUPPLEMENTAL JURISDICTION

2.      This Court has "supplemental jurisdiction" over Plaintiff's state law claims under 28 U.S.C. § 1367(a) because this Court has original jurisdiction over this action and all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

### ARTICLE III AND PRUDENTIAL STANDING

3.      Plaintiff has Article III standing because Defendants' retaliation in violation of § 504 (1) has caused Plaintiff to suffer an "injury in fact-an invasion of a legally protected interest which is (a) concrete and particularized" , and  (b) "actual or imminent,  not 'conjectural' or 'hypothetical,'" (2) the injury was causally connected to Defendants' actions, and (3) it is "likely" as opposed to merely "speculative," that Plaintiff's injuries can and will be "redressed by a favorable decision."

4.      Plaintiff have prudential standing because (1) in enacting § 504, Congress conferred standing on any individual who has

–2–

been intimidated, threatened, coerced, or discriminated against for the purpose of interfering with protected rights under 504s to bring an action for retaliation, (2) the claims asserted by Plaintiff are not " generalized grievances," and (3) the relief sought by Plaintiff is within the "zone of interests" protected by § 504.

## VENUE

5.      Venue is proper in this District under 28 U.S.C. § 1391(b) because Keeton's claims arose entirely within the Northern District of Georgia.

## PARTIES

6.      Plaintiff COLLETTE KEETON is a resident of the Northern District of Georgia and now is also a caretaker in Georgia and a distant caretaker in Mississippi.

7.      Defendants DEKALB COUNTY SCHOOL DISTRICT (DCSD) controls and manages the public schools in DeKalb County, Georgia, including Special Education programs, based on the authority granted to it in the GA. CONST. art. VIII, § 5, ¶¶ 1 and 2 and GA. CODE ANN. § 20-2-50. DCSD can be served by delivering a copy of the summons and complaint to its Superintendent Michael

Thurmond, at 1701 Mountain Industrial Boulevard, Stone Mountain, Georgia 30083.

Defendants Georgia Department of Labor (GDOL) handles workforce appeals and FMLA violation complaints. GDOL may be served by delivering a copy of the summons and complaint to its Commissioner, Mark Butler, at 148 Andrew Young International Blvd, N.E., Ste. 525, Atlanta, GA 30303-1734.

Defendants Heather McElroy, and Stone, McElroy and Associates are public safety psychological testing providers for hire. Heather McElroy, and Stone, McElroy and Associates can be served by delivering a copy of the summons and complaint to Heather McElroy and the owners of Stone, McElroy and Associates at Ridgeview Institute Professional Building South, 4015 South Cobb Drive, Suite 265, Smyrna, Georgia, 30080.

Defendants The Standard Insurance Company are disability insurance providers selected by school districts in the State of Georgia among other states. The Standard Insurance Company may be served by delivering a copy of the summons and complaint to 900 SW Fifth Ave, Portland, OR 97204-1235.

FACTS

8.     Keeton is an Instructional Technology Specialist educator who holds the following certifications in Georgia:

-4-

| Type | Field | First Issued | Current Issued | Begin Validate | End Validate |
|---|---|---|---|---|---|
| SRL | DIRECTOR OF TECHNOLOGY CAREER EDUCATION [FLD796] | 02/14/2005 | 06/02/2014 | 07/01/2014 | 06/30/2019 |
| SRL | EDUCATIONAL LEADERSHIP (P-12) [FLD704] | 04/30/2006 | 06/02/2014 | 07/01/2014 | 06/30/2019 |

The Standard Professional leadership certificate indicates that all requirements for professional leadership certification have been met, including applicable Special Georgia Requirements. The Standard Professional leadership certificate is issued to Georgia educators completing GaPSC-approved educator preparation programs prior to September 30, 2009. It is also issued to educators who meet reciprocity requirements.

| SRT | AUDIO VISUAL TECHNOLOGY AND FILM [FLD652] | 06/02/2014 | 06/02/2014 | 07/01/2014 | 06/30/2019 |
| SRT | BUSINESS EDUCATION (6-12) [FLD783] | 10/20/2004 | 06/02/2014 | 07/01/2014 | 06/30/2019 |
| SRT | CAREER EXPLORATION (PECE) [FLD749] | 02/11/2011 | 06/02/2014 | 07/01/2014 | 06/30/2019 |
| SRT | CAREER TECHNICAL INSTRUCTION (CTI) [FLD810] | 07/25/2012 | 06/02/2014 | 07/01/2014 | 06/30/2019 |
| SRT | COORDINATED CAREER ACADEMIC EDUCATION (CCAE) [FLD770] | 02/11/2011 | 06/02/2014 | 07/01/2014 | 06/30/2019 |
| SRT | EARLY CHILDHOOD EDUCATION (P-5) [FLD808] | 01/12/2005 | 06/02/2014 | 07/01/2014 | 06/30/2019 |
| SRT | GIFTED (P-12) CONSULTATIVE [FLD780] | 06/02/2014 | 06/02/2014 | 07/01/2014 | 06/30/2019 |
| SRT | GIFTED - LANGUAGE ARTS CONCENTRATION [FLD963] | 06/02/2014 | 06/02/2014 | 07/01/2014 | 06/30/2019 |
| SRT | GIFTED - MATHEMATICS CONCENTRATION [FLD961] | 06/02/2014 | 06/02/2014 | 07/01/2014 | 06/30/2019 |
| SRT | GIFTED - READING CONCENTRATION [FLD965] | 06/02/2014 | 06/02/2014 | 07/01/2014 | 06/30/2019 |
| SRT | GIFTED - SCIENCE CONCENTRATION [FLD962] | 06/02/2014 | 06/02/2014 | 07/01/2014 | 06/30/2019 |
| SRT | GIFTED - SOCIAL SCIENCE CONCENTRATION [FLD964] | 06/02/2014 | 06/02/2014 | 07/01/2014 | 06/30/2019 |
| SRT | GIFTED IN-FIELD [FLD881] | 09/19/2008 | 06/02/2014 | 07/01/2014 | 06/30/2019 |
| SRT | IT - INFORMATION SERVICES AND SUPPORT [FLD662] | 06/02/2014 | 06/02/2014 | 07/01/2014 | 06/30/2019 |
| SRT | IT - INTERACTIVE MEDIA [FLD663] | 06/02/2014 | 06/02/2014 | 07/01/2014 | 06/30/2019 |
| SRT | IT - NETWORK SYSTEMS [FLD661] | 06/02/2014 | 06/02/2014 | 07/01/2014 | 06/30/2019 |
| SRT | IT - PROGRAMMING AND SOFTWARE DEVELOPMENT [FLD664] | 06/02/2014 | 06/02/2014 | 07/01/2014 | 06/30/2019 |
| SRT | LAW, PUBLIC SAFETY, CORRECTIONS AND SECURITY [FLD670] | 06/02/2014 | 06/02/2014 | 07/01/2014 | 06/30/2019 |
| SRT | MIDDLE GRADES (4-8) - LANGUAGE ARTS [FLD853] | 01/12/2005 | 06/02/2014 | 07/01/2014 | 06/30/2019 |
| SRT | MIDDLE GRADES (4-8) - MATH [FLD851] | 01/12/2005 | 06/02/2014 | 07/01/2014 | 06/30/2019 |
| SRT | MIDDLE GRADES (4-8) - READING [FLD855] | 01/12/2005 | 06/02/2014 | 07/01/2014 | 06/30/2019 |
| SRT | MIDDLE GRADES (4-8) - SCIENCE [FLD852] | 02/11/2011 | 06/02/2014 | 07/01/2014 | 06/30/2019 |
| SRT | MIDDLE GRADES (4-8) - SOCIAL SCIENCE [FLD854] | 01/12/2005 | 06/02/2014 | 07/01/2014 | 06/30/2019 |
| SRT | READING ENDORSEMENT [FLD833] | 09/11/2008 | 06/02/2014 | 07/01/2014 | 06/30/2019 |
| SRT | SP ED ADAPTED CURRICULUM (P-12) CONSULTATIVE [FLD805] | 10/22/2010 | 06/02/2014 | 07/01/2014 | 06/30/2019 |
| SRT | SP ED GENERAL CURRICULUM (P-12) CONSULTATIVE [FLD798] | 10/20/2004 | 06/02/2014 | 07/01/2014 | 06/30/2019 |
| SRT | SP ED LANGUAGE ARTS COGNITIVE LEVEL (P-5, 4-8, 6-12) [FLD932] | 02/11/2011 | 06/02/2014 | 07/01/2014 | 06/30/2019 |
| SRT | SP ED MATH COGNITIVE LEVEL (P-5, 4-8, 6-12) [FLD912] | 02/11/2011 | 06/02/2014 | 07/01/2014 | 06/30/2019 |
| SRT | SP ED READING COGNITIVE LEVEL (P-5, 4-8, 6-12) [FLD952] | 02/11/2011 | 06/02/2014 | 07/01/2014 | 06/30/2019 |
| SRT | SP ED SCIENCE COGNITIVE LEVEL (P-5, 4-8) [FLD921] | 02/11/2011 | 06/02/2014 | 07/01/2014 | 06/30/2019 |
| SRT | SP ED SOCIAL SCIENCE COGNITIVE LEVEL (P-5, 4-8, 6-12) [FLD942] | 02/11/2011 | 06/02/2014 | 07/01/2014 | 06/30/2019 |
| SRT | TELECOMMUNICATIONS [FLD672] | 06/02/2014 | 06/02/2014 | 07/01/2014 | 06/30/2019 |
| SRT | WORK BASED LEARNING ENDORSEMENT [FLD793] | 10/20/2004 | 06/02/2014 | 07/01/2014 | 06/30/2019 |

9.     Keeton began working for DCSD on January 9, 2006, as a High School Business Technology Education Teacher, and, throughout her career served in various positions, including, Elementary Instructional Reading Title 1 Specialist, Self-Contained Teacher, Computer Tech Classified Position, Middle School Interrelated MOID (Moderately Intellectual Disability) teacher, and, finally, a Middle School Business Computer Science Teacher.

10.     Keeton suffers from the following conditions: Asthma, Post-Traumatic Stress Disorder, Respiratory Airway Disease, Chronic Fatigue Syndrome, and Depression/Anxiety.

**FACTS RELEVANT TO KEETON'S**

## CLAIM FOR RETALIATION UNDER THE FAMILY
## MEDICAL LEAVE ACT OF 1993

## AND THE AMERICANS WITH DISABILITIES ACT

11.     Keeton took  FMLA in 2008 from September 9, 2008 to approximately November 23, 2008.

12.     On or about November 12, 2008 Keeton and her family lost medical coverage.

13.     Keeton returned to work on November 23, 2008.

14.     Regardless of her presenting her return to work notice

from FMLA leave, on November 23, 2008, and not being out for 60-days or more, DCSD put another teacher in Keeton's place and placed Keeton on two or more additional days of leave without pay pending the district finding her a place to go in the district.

15.     January 7, 2009, Keeton was displaced and assigned to Toney Elementary without medical restoral or pay restoral until an investigation by a teacher's union and the DCSD Office of Internal Affairs (OIA) yielded Keeton was due back to Keeton.

16.     Keeton took FMLA and intermittent FMLA leave from October 20, to December 13, 2010.

17.     Keeton returned to work on December 14, 2010.

18.     Despite being cleared to return to work from FMLA leave, on December 15, 2010, DCSD placed Keeton on administrative leave pending a "fitness for duty examination."

19.     Keeton    was    placed    on    improvement leave/administrative leave from about September 2010 to October 2010 without the hearing being held to determine such leave.

20.     DCSD thereafter refused to allow Keeton to return to work for months despite her priority placement displacement status and the availability of several positions for which Keeton was qualified and applied for the positions.

21.     On April 15, 2011, DCSD's Interim Superintendent, Ra-

mona Tyson, informed Keeton DCSD was terminating Keeton's employment and non-renewing her contract for the next school year because Keeton was "unfit for duty."

22.     In addition thereto, DCSD refused to provide –-and continues to refuse to provide— Keeton with her 2009, 2010 and 2012 performance evaluations, which indicate that Keeton's performance met or exceeded expectations.

23.     Further, DCSD refused to correct or remove –and continues to correct or remove invalid evaluations of 2008, 2011, 2012, and 2013 that were all rendered, changed and not served and mailed to Keeton while Keeton was on approved FMLA leaves, DCSD set improvement/administrative leaves or other DCSD leaves of absence given to Keeton.

24.     On April 28, 2011, DCSD sent Keeton a letter by certi-fied mail a "Notice of Charges," which purported to inform Keeton that DCSD was dismissing her for "incompetency" as a High School teacher due to McElroy's misdiagnosis of Keeton and "other good and sufficient cause."

25.     On October 4, 2011, DCSD supplemented the "Notice of Charges," by e-mail of "Keeton's communication, lack of organiza-tion and lack of attention also exemplified her unfitness for duty." ,,,"Keeton's verbal and written communication was often disjointed

ramblings, indicating she did not have the ability to articulate clearly or arrange coherent sentences…" and "any other good and sufficient cause" of Keeton rendered unfit for duty by DCSD's paid licensed psychologist but refused to provide Keeton with a copy of the supplement.

26.    DCSD also refused to provide Keeton with a copy of a "Fitness for Duty Psychological Evaluation" conducted by a Dr. Heather McElroy.

27.    Despite repeated requests, beginning October 6, 2011, DCSD, Heather McElroy, and McElroy's office would not provide many of the "Collateral Information" documents listed on the cover of the psychological evaluation to Keeton or her counsel.

28.    DCSD, McElroy and Stone, McElroy and Associates re-fused to give Keeton or her counsel the "personal history question-naire" or full documents that DCSD indicated it would introduce against Keeton at the Fair Dismissal Hearing of November 29-30, 2011.

29.    Keeton exercised her HIPPA rights that were violated when Dr. Heather McElroy testified at the November 29-30, 2011 tribunal after repeated written requests to Heather McElroy and members of Stone, McElroy and Associates not to release any of Keeton's medical information in any form such as the video McElroy

acquired at the third meeting she did not testify about under oath at the November 2011 Tribunal.

30.    On November 30, 2011, a Hearing Tribunal appointed by the DeKalb County Board of Education rejected DCSD's charge that Keeton was "incompetent," and stated that "Dr. Keeton received satisfactory annual reviews and positive classroom evaluations. Additionally, there was no testimony that Dr. Keeton failed to perform her classroom duties."

31.    The Hearing Tribunal also rejected DCSD's contention that there was "other good and sufficient cause" to terminate Keeton stating, "There was insufficient testimony regarding other good and sufficient cause."

32.    The Hearing Tribunal ordered DCSD to reinstate Keeton, renew her contract, and transfer her to a different school.

33.    After DCSD complied with the Hearing Tribunal's reinstatement, renewal and transfer order, on or about August 9, 2012, Keeton demanded that DCSD reimburse her for back pay due under state law and because DCSD violated the Family Medical Leave Act.

34.    DCSD refused to provide Keeton with the back pay that she was owed and engaged in repeated acts of retaliation in reprisal for Keeton's assertion of back pay under the state law and FMLA. The reprisals included negative performance evaluations based on

false information, retaliatory assignments, displacements and transfers, labeling Keeton a "chronic FMLA medical leave, sick leave and personal leave abuser," the unlawful release of Keeton's medical records, loss of medical coverage, withholding Keeton's personal property, giving Keeton LWOP with available leave she requested to use but was denied by DCSD, loss of supplemental jobs in district and income, loss of stipends and merit awards not initially given to exceptional education teachers who were left out of grants and not considered teachers, being placed in RIF or Reduction In Force positions, being taught out of field to fire Keeton for not being certified in a position she was moved to not hired to teach in the district, baring promotion by denying professional development and having Keeton train others DCSD promoted, fining Keeton for not taking tests DCSD said she could not take while on FMLA or other leave, sending $22,134.83 to the State of Georgia Unclaimed Property Division to deny Keeton part of the back pay owed to her.

36.    Meanwhile, Keeton had been compelled to file a charge of disability discrimination with the EEOC, which, with the EEOC's intervention, resulted in a settlement under which DCSD reinstated Keeton to her position with back pay in accordance with the findings of the tribunal.

36.    On or about August 16, 2012, Keeton notified DeKalb

County that she needed FMLA leave due to an illness and/or disability.

37.    DCSD refused Keeton her leave and placed her on leave without pay status in an attempt to terminate her employment in retaliation for her assertion of her rights under the Rehabilitation Act/ADA and FMLA.

38.    Keeton was once again compelled to fight for reinstatement to her position and, in January, 2013, DCSD returned Keeton to work and transferred her to a different school.

## FACTS RELEVANT TO KEETON'S RETALIATION CLAIM UNDER 504, TITLE II OF THE ADA, AND THE FIRST AMENDMENT TO THE UNITED STATES <u>CONSTITUTION</u>

39.    Beginning in August of 2007 or so, Keeton repeatedly complained that students with disabilities are not receiving a free and appropriate public education as required by federal law.

40.    Keeton specifically complained about the following conduct that she reasonably believed constituted a violation of § 504 of the Rehabilitation Act of 1973 and/or the Individuals with Disabilities in Education Act (IDEA):

    a. Special Education students in Keeton's classes were not placed in a least restrictive environment (small group), but

DCSD failed and refused to place these students in these groups;

b. Students with disabilities, including students with 504 plans and a self-contained setting were denied their right to a highly qualified teacher with adaptive assistive certification and given a paraprofessional with certification for general population inclusion and collaborative students.

c. Students with disabilities, including students with 504 plans and Individual Education Plans (IEPs) were denied the use of assistive technology, support, equipment, materials, and even basic supplies;

d. DCSD violated the law in disciplining students with disabilities by failing to follow proper procedures and failing to notify parents;

e. Special Education students attending DCSD were regularly subjected to violence and bullying without prevention, investigation, intervention or notification;

f. DCSD unlawfully segregated children with disabilities and denied them participation in school functions.

41.    On January 18, 2013 Keeton reported to Mary McLeod Bethune Middle School in accordance with a transfer ordered by DCSD. That day, Keeton toured her new classroom with the long term substitute teacher who handled the class before Keeton's transfer to Mary McLeod Bethune Middle School. During this initial tour, a child with a disability was assaulted by a regular education student. Based on her experience and observations that day, Keeton could tell that 25% or more of the students were in Special Education. It was also apparent that the school district had serious problems in complying with federal law. Keeton therefore requested

information that would identify to her the children in Special Education, their specific conditions, needs, copies of IEPs and Behavioral Plans. Despite Keeton's repeated requests between January 18 and 31, 2013, DCSD refused to provide the requested information to Keeton.

42.    Keeton noted and pointed out to the Principal of the school the following problems:

- The school failed and refused to provide Keeton with the IEPs of Special Education Students in a total of 216 or so students served for the third nine weeks of the second semester of school in 2013;

- The classroom had a minimum of 36 students in each even and odd class of 6th, 7th and 8th graders and 32 computers, only 20 of which were operable;

- Exceptional Education Students did not have the textbooks and/or handouts necessary to do assignments and homework;

- There was no assistive technology for the Special Education children in the form of software and computers adapted for Special Education children;

- Special Education Students were constantly subjected to physical and verbal attacks and threats. Regu-

lar Education Students routinely pushed Special Education Students off computers, took materials and belongings (book bags, money, video games, food) from Special Education Students, and attacked and threatened Special Education Students in the classroom and hallways;

- Special Education Students were subjected to cyber-bullying and there was no monitoring software to prevent the viewing and dissemination of threats and racist attacks on Special Education students;

- There was no filtering software to prevent students from viewing websites and social networks that promote gang activity, violence, and racial incitement. Access to inappropriate websites and social networks facilitates cyber-bullying of Special Education Students;

- Special Education Students lacked basic supplies, such as pencils, folders and paper;

- The school routinely disciplined Special Education Students without regard to the student's disabilities.

43.     In late January 2013, Keeton again complained about all of the above issues with Special Education Students. Keeton com-

plained that she did not have access to eSIS for grade or attendance reporting, and reiterated that she had 36 students in her classes and only 20 functioning computers, missing texts, no adaptive assistive technology, and none of the basic supplies such as pencils, folders and paper. Keeton reiterated that it was impossible to accommodate or support Special Education Students using the appropriate grade scale because the school refused to identify the Special Education Students. Keeton complained about the violence and overcrowding.

44.    On and before January 31, 2013 Keeton asked DCSD for prior and current student rolls to apply for Master Teacher and Keeton was denied access to her own student rolls and for the designation.

45.    On February 1, 2013, Keeton suffered injuries when a student battered and assaulted her. The assault was gang-related, and Keeton pointed out to DCSD officials that the student who battered her was also battering and stealing from Special Education Students. DCSD took no action against the student for assaulting Keeton and/or the Special Education Students.

46.    On February 19, 2013 a Special Education Student was assaulted, but DCSD took no action.

47.    On February 21, 2013, Keeton vociferously complained to DCSD officials about the treatment of Special Education Students

especially the bullying.

48.     On February 22, 2013, Keeton complained again to the Principal, who immediately placed Keeton on a Professional Development Plan (PDP) because Keeton complained that DCSD was violating § 504 and IDEA and due to her advocacy on behalf of Special Education students.

49.     On February 25, 2013, Keeton complained that the Special Education Students had been denied access to resources and supplies that were actually sitting in a closet at the school. DCSD refused to give Keeton an explanation as to why Special Education Students were denied textbooks and basic supplies such as pencils, folders and paper.

50.     On March 3, 2013, Keeton filed a complaint with the Office of Civil Rights for the U.S. Department of Education (OCR), and asserted that DCSD unlawfully retaliated against her for asserting that the school district violated § 504 and IDEA and because Keeton advocated on behalf of Special Education students.

51.     On March 4, 2013 Keeton sent a copy of the formal complaint to DCSD Superintendent and all parties by e-mail.

52.     On March 4, 2013, Keeton returned to work after receiving medical treatment relating to the assaults, battery and harassment. DCSD stated Keeton had to go to the DCSD main office to

present clearance from her doctor before she could return to work in attempts to make Keeton miss the student tribunal. Keeton returned in time with the proper forms and testified that day at the student tribunal held at Mary McLeod Bethune Middle School.

53.     From March 5, 2013 to March 11, 2013 Keeton was continuously harassed, over-evaluated, and disparately treated because she asked for access to the school network that she was locked out of at that time to perform her work duties, to receive pencils, paper, a working printer, computers that would operate software programs so they would not have to use free programs so much, laptops to cover the computer shortage in class, student teachers, more textbooks or electronic site licenses, full copies of student IEPs that Keeton may sign to receive and view as a certified exceptional teacher and a certified Career Technical Instruction Teacher serving Business Computer Technology Education Students with disabilities, a copy of the video tape of the February 1, 2013 incident occurring in the hall enroute to bus duty, the campus police report of February 1, 2013 that the officer said was not filed, a copy of any discipline referral for the involved students, a copy of Keeton's testimony at the student tribunal of March 4, 2014 and the decision, change in student access to district computers from teachers on the system to only students in the system and other safeguards for

keeping the students safe, in their least restrictive environment and in providing appropriate accommodations and services since Keeton was told by the principal there that the principal was going to change Keeton's student grades and nothing in the teaching and learning environment was going to change despite the adversity and disparities.

54.     On March 11, 2013 during Keeton's lunch and planning that were union-fought and won to be uninterrupted, Triscilla Weaver, principal of Mary McLeod Bethune Middle School entered Keeton's class with a printed PDP that Keeton could not accessed due to being blocked from the DCSD system trying to force Keeton to sign the document. Keeton refused to sign and asked to reschedule any meetings to other times when Keeton did not have a scheduled doctor's appointment to attend that Weaver made Keeton alter Weaver about each time Keeton needed leave to get medical attention.

55.     Weaver was incensed and sent security to Keeton's class when class was almost over telling the security officer that Keeton had to go to the district because Keeton was fired. Late evening on March 11, 2013 Keeton took FMLA leave and asked to use her available leave before going on Short-Term Disability or Workman's Compensation. All leave for Keeton was denied by DCSD to date or

–19–

has not been shared with Keeton upon repeated open records requests.

56. OCR acknowledged Keeton's formal complaint on March 12, 2013.

57. From March 28, 2013 to present, Weaver continued to inflict Leave Without Pay (LWOP) on Keeton even with leave requested by Keeton and available for Keeton to use.

58. On or around April 28, 2013 Weaver administered a retalitory online evaluation on Keeton giving her a Needs Development or "N" rating while Keeton was on approved sick leave. Weaver accused Keeton of breaking equipment not lesson planning after blocking Keeton from the site network and then them DCSD doing so I district Intranet change over and through terminations of Keeton.

59. In 2012, roughly 25 to 32 disabled students were given a gifted benchmark test because Keeton did not have access to TeacherNet to download the appropriate test for students in her classes during the 2012 school year.

60. A regular education teacher told Keeton and her students that they were denied access to practice Benchmark and other tests because they could not pass them.

61. Keeton complained to her principal and she was grant-

ed a transfer to prevent violation of her student's rights.

## FACTS RELEVANT TO GRIEVENCES FILED IN 2007-2008, AND 2010

62.     In 2007-2008 Keeton was teaching out of field for more than 67% of the school day in violation of exceptional student rights and Keeton's rights that entitles all students in her classes to free education and Keeton to damages.

63.     Keeton reported to DCSD the failure to report by administrators on class equipment conditions and misappropriations since all of the computers in the class were stolen and in police custody for the whole year.

64.     Keeton was injured by a student when Cedar Grove Administrators set a tardy table and the student was pulling on the door to get in to avoid punishments. Keeton reported the student and the students group and they stole, destroyed and dismantled her personal property as well as other students' personal property. The students were not disciplined and placed back into the classroom. Keeton was not allowed to go get medical attention for her injuries and accused of injuring herself even with two teacher witnesses. Students were allowed to continue to threaten Keeton without any reprocussions. Keeton called parents and told administrators she would press charges.

65. Then, Keeton was over-evaluated daily, harassed/bullied, not allowed to add certifications to her educator certificate to prevent out-of-field-teaching for additional years, not allowed to take professional development provided by DCSD, given an unsatisfactory evaluation in error that had to be corrected at the Georgia Professional Standards Commission in 2008 to prevent her from not getting credit for instruction the entire 2007-2008 school year or pay increases.

66. Keeton was also given a PDP with no goals and objectives in error since, the PDP was for administrators who were to come up with a plan to ensure not violating student and teacher rights by teaching out-of-field for the majority of the school day

67. Keeton was displaced, undisplaced back to Cedar Grove High School by Jo-Ann Williams West and then moved to another site in the district. Nothing was done to the infracting administrators Jo-Ann Williams West, Constance Franklin, or Pammy Darden. The students, parents and Keeton were not given notice of injuries sustained that DCSD was to remedy or any courses to ensure they received rigorous and relevant and free and appropriate education. DCSD refused to provide the student rolls to Keeton and has changed some of the rolls to block those injured from receiving their restitutions.

68.    In 2010 Keeton filed a grievance for not receiving any equipment, supplies, materials for a new self-contained class. DCSD said it was not filed but produced it at the November 29-30, 2011 tribunal. DCSD depicted Keeton's reports of bullying and teaching and learning conditions as rambling, incoherent and so forth to prevent the reports.

69.    Keeton reported bullying, cyber-bullying, cyberbating of a district or lead teacher, Clarence W. Anderson, Jr. sharing Keeton's information with all maliciously to discredit Keeton because he said Keeton Georgia Alternative Assessment (GAA) tested a student without proper teacher certification.

70.    Jacnith Romney-Drayton wrote a memo stating Keeton did not change her student or perform her job duties and posted it for all to see and share as well. Keeton refuted it and checked at the district on protocol for changing students during bus pick-up and them reporting home. DCSD leaders said that Keeton could change students by herself whether male or female because she was female and bared children. While males could only change male students.

71.    Anderson said that Keeton's students were the lowest and they did not count like Dr. Wheelers then Annette Thomas' students higher performers and Keeton needed to get over to the class and get their grades input into the system and leave her stuff

for the sub since she was no better. He said that Keeton and her paraprofessional did not matter and he wanted the old people back not what DCSD left. He wanted a male teacher not Keeton who is female and sought out and succeeded in getting a male teacher for Keeton's former job.

72.    He wrote Keeton up for failure to accurately report on GAA. Yet, the student scores were used and all other students in Keeton's class lost their rights to their highly qualified teacher and had less than highly qualified teachers without proper certifications.

73.    Clarence Anderson, Jr. said he was reporting Keeton to Toney Eitel, then testing administrator for DSCD and telling him to fire her for not giving him GAA. Even though Anderson was reporting to Keeton and others that the student would not test. FTE was taken on the student and the student had to test.

74.    Keeton was routinely threatened, intimidated, asked for her passwords by Clarence Anderson, Jr. to change Keeton's work and continue the mishandlings. Anderson, tried to get her fired for asking that the student not get GAA tested because the student was not old enough, was truant, was not in the least restrictive environment and DCSD did not give Keeton anything to GAA test the student with so she had to use her own items to test the student when that is to be DCSD supplied.

75.    Keeton was given a letter of reprimand by Testing Administrator Lisa Wimberly, who is now retired. It was placed in Keeton's box and removed and passed around for everyone at the work site to see.

76.    In retaliation for Keeton stating DCSD had a failure to report along with other issues Keeton was given a PDP by James H. Jones while placed on paid administrative leave DCSD enacted. Keeton was ostracized, taunted, disparately treated, told she was not Highly Qualified when she was then and is now Highly Qualified.

77.    Keeton was locked in her classroom and not let out until she produced GAA. When Keeton asked to leave the school she was not allowed to go and told that the principal of McNair High School at that time was satisfied with her work and did not give her permission to transfer.

78.    A paraprofessional with one of Keeton's same certifications was then placed in Keeton's instructional position and plans were made for a substitute teacher to take Keeton's place.

79.    Keeton asked for a promotion, or transfer to fix the slight of having a paraprofessional rather than a teacher take Keeton's position wrongfully. She also insisted that the electronic write up be unsent and the hardcopy be removed from her file.

80.    In psychiatric reprisal, Keeton was rendered unfit from

–25–

the psychological performed in error with the wrong instrumentation by Heather McElroy. Then, Keeton was placed on administrative, improvement and extended leaves of absences.

## DCSD'S 2010-2011 NONRENEWAL OF KEETON; TERMINATION OF KEETON'S EMPLOYMENT IN 2013 AND 2014 AND KEETON'S SUBSEQUENT CHARGES OF <u>DISCRIMINATION WITH THE EEOC</u>

81.     On or about December 14, 2010 Keeton returned to work with doctor consent.

82.     On or about December 15, 2010, DCSD sent Keeton back home on paid administrative leave directing her to not do anything in the name of DCSD pending a fitness for duty test. Robin Goolsby, the DCSD Disability Liaison at that time, asked could Keeton be non-renewed for unfitness for duty for having a psychologist rendered disability from their paid psychologist.

83.     DCSD and Heather McElroy has denied my actual disabilities and has treated Keeton as if Keeton has a disability whether Keeton had one or not under the federal definition of persons with disabilities.

84.     The Standard Insurance Company's decision was that Keeton qualified for Short-Term Disability during 2010-2011.

85. In 2013 The Standard Insurance Company's decision was that Keeton did not have a disability or has not had a disability during 2013. However, due to student injuries she did qualify for Workman's Compensation that she gave up by not reporting the injury timely.

86. On or about May 28, 2013 and May 31, 2013, Keeton presented DCSD with return to work releases signed by Keeton's physicians.

87. DCSD acknowledged receipt since June 1, 2013 Keeton's medical was restored. However, DCSD refused to call Keeton back to work after taking a necessary medical leave. So, her contract for the 2012-2013 school year expired on or around June 27, 2013 and her medical was again terminated.

88. May 25 and May 26, 2013 Keeton applied for unemployment and was ineligible since DCSD had her listed as on a leave of absence not approved FMLA, Short-Term or Long Term Disability or Workman's Compensation.

89. Keeton appealed weeks of unemployment due from about June 1, 2013 to July 16, 2013 that still has not been paid when Keeton was rated eligible for unemployment. DCSD never attended any unemployment hearing to alert Keeton of her status with DCSD, provide her approved FMLA or other documents listed that were

used in her terminations or to offer her a contract.

90. On or about July 17, 2013 Keeton applied for unemployment under the new eligibility period. Keeton was rated eligible from August 2, 2013 to August 1, 2014 but only received payments seven to nine weekly payments in mid-October of 2013 to November of 2013 and one payment on or about February 5, 2014 during that period.

91. On August 5, 2013, DCSD issued a Notice of Termination of Employment after approving her FMLA leave March 28, 2013 but did not release this notice to Keeton until after June 11, 2014.

92. On August 9, 2013, DCSD reversed its decision and placed Keeton on approved FMLA Leave: Long Term Disability. However, Keeton was not noticed about this to date and no payments of Short-Term Disability, Workman's Comp, or any available leave has been paid even when she was under doctor's care but Keeton was now released from doctor's care. DCSD's placement of Keeton on FMLA Long-Term Disability is in violation of her FMLA rights.

93. August 10, 2013 Keeton attended the funeral of her maternal grandmother. Keeton was not noticed to return to work before or after bereavement, that she had a new contract to sign or about her work assignment.

94.    On or about September 5, 2013 Keeton received a verification of experience form from DSCD that does not list Keeton as having a work assignment for the 2013-2014 School Year. Nor did it list any unsatisfactory or needs development performance ratings. However, Keeton's salary was redacted as confidential even to Keeton.

95.    October 10, 2013 Keeton received a professional development transcript of coursework completed that was lost or not posted and the transcript listed Keeton as out of the DCSD system and had no address on file listed on the form.

96.    October 18, 2013 or so Keeton claimed funds by deadline in a notice of unclaimed funds sent around September 25, 2013. Keeton did claim the funds as some of the portions due from 2009-2013 and contends more is due that DCSD refuses to restore.

97.    November 25, 2013 Keeton in-processed with Shelby County Schools in Memphis, TN.

98.    December 2, 2013 Keeton reported to duty as an educator in Shelby County Schools.

99.    January 1, 2014 Keeton's medical with DCSD was restored and terminated on January 12, 2014.

100.    On or about January 20, 2014 Keeton involuntarily resigned from Shelby County Schools for work related issues and for

Caregiving.

101.    January 27, 2014 Keeton reapplied for unemployment and presented work history for both DCSD and Shelby County Schools. Yet, the GADOL representative only submitted work history from Shelby County Schools even though she said DCSD had a check available in the system for Keeton as if Keeton was restored to duty with DCSD.

102.    January 31, 2014 a check listed as base pay in the amount of about $300.24 was cut to Keeton from DSCD.

103.    Keeton contacted DCSD on or about January 31, 2014 to notify DCSD that she had no contract for the current school year of 2013-2014 and asked what back pay period the income covered.

104.    On April 11, 2014 Keeton filed a Judicial Review against DCSD as directed by GADOL.

105.    On April 18, 2014 Keeton filed a continuing EEOC complaint. EEOC issued the right to sue on Keeton's request as of April 18, 2014.

106.    On April 18, 2014, after failing to contact Keeton for nearly one year, DCSD issued a "Notice Pursuant to O.C.G.A. 20-2-940 *et seq.*" (Notice of Termination), which purported to advise Keeton of DCSD's Superintendent's recommendation to terminate her employment with DCSD.

107. DCSD did not mail the Notice of Termination until April 21, 2014.

108. The letter required Keeton to appear for a hearing under Georgia's Fair Dismissal Law at 11:00 a.m., May 1, 2014.

109. As a direct result of DCSD's failure to comply with its procedures and the requirements of Georgia's Fair Dismissal Law, Keeton was unable to defend herself at the May 1, 2014 hearing.

110. May 19, 2014 or thereabout, Keeton asked for a hearing reschedule but was denied and still was not noticed she was terminated as of early August of 2013 and June 23, 2014. At that time and on multiple occasions Keeton asked for her employment evaluations from 2006-2014 but DCSD open records refused to give any documents to her.

111. Keeton contacted GADOL before and around July 3, 2014 because she was blocked from reporting on the GADOL system.

112. On July 3, 2014 Keeton provided GADOL lawyers with the terminating documents she received to uphold Keeton's FMLA rights and to investigate the terminations validity. To date she has heard no word from GADOL either.

113. These violations included, but were not limited to, (a) allowing less than qualified teachers to provide instruction and

other services to Special Education Students, (b) reducing the services set forth in Individualized Education Plans (IEPs) in violation of IDEA and DOE regulations that implement IDEA and guarantee Special Education Students a "free and appropriate public education," (c) making false and misleading statements to the parents/guardians of Special Education Students, and (d) refusal to provide services to one or more Special Education Student based on the students' race (White) and the nature of the students' disabilities (Autism and ADHD).

114. Beginning in January, 2013, Keeton repeatedly complained that students with disabilities are not receiving a free and appropriate public education as required by federal law.

115. Keeton specifically complained about the following conduct that she reasonably believed constituted a violation of § 504 of the Rehabilitation Act of 1973 and/or the Individuals with Disabilities in Education Act (IDEA):

a. Special Education students in Keeton's classes were required to have Behavioral Intervention plans with specific, detailed instructions for classroom place in a least restrictive environment (small group), but DCSD failed and refused to place these students in these groups;

-32-

b. Students with disabilities, including students with § 504 plans and Individualized Education Plans (IEPs) were denied the use of assistive technology, support, equipment, materials, and even basic supplies;

c. DCSD violated the law in disciplining students with disabilities by failing to follow proper procedures and failing to notify parents;

d. Special Education students attending DCSD were regularly subjected to violence and bullying without prevention, investigation, intervention or notification;

e. DCSD unlawfully segregated children with disabilities and denied them participation in school functions.

116. DCSD placed Keeton on a Professional Development Plan (PDP) because she complained that DCSD was violating 504 and IDEA and due to her advocacy on behalf of Special Education students.

117. On March 3, 2013, Keeton filed a complaint with the Office of Civil Rights for the U.S. Department of Education (OCR), and asserted that DCSD unlawfully retaliated against her for asserting that the school district violated 504 and IDEA and because Keeton advocated on behalf of Special Education students.

118. OCR acknowledged Keeton's formal complaint on

March 12, 2013.

119.   Keeton updated her EEOC complaint in April of 2014 and again on June 20, 2014 or so due to the unlawful retaliation by DCSD. Keeton was involuntarily resigned in her employment, with DCSD on March 29, 2014 or so due to Leave Without Pay (LWOP) reporting and other employment separations unilaterally imposed on Keeton by DCSD and its agents Triscilla Weaver and her teacher support team.

120.   DCSD and its agents retaliated and decided to fire Keeton for updating and attempting to file another EEOC complaint to protect her rights.

## COUNT I

### RETALIATION UNDER
### § 504 OF THE REHABILITATION ACT OF 1973,
### 29 U.S.C. § 794

### (DCSD ONLY)

121.   Plaintiff re-alleges each paragraph enumerated 1 through 120 as if fully set forth at length in this paragraph.

122.   DCSD is a  recipient of federal financial assistance as the terms "recipient" and "federal financial assistance" have been defined in § 504 and applicable regulations.

123.   DCSD is subject to the prohibitions of § 504 and have provided assurance of compliance with the anti-discrimination provisions of § 504 to the United States government.

124.   DCSD, its Special Education Department, which is within DCSD's administrative control and direction, and all other DCSD operations are part of the education "program" and "activity" contemplated within the meaning of § 3a of the Civil Rights Restoration Act of 1987, 20 U.S.C. § 1687 and 34 C.F.R. §§ 106.2(h)(1)(i), (ii); (h)(2)(i).

125.   DCSD is not immune under the Eleventh Amendment of the Constitution of the United States from suit in federal court for violation of § 504, or because the acts complained of in this action occurred after October 21, 1986.

126.   This count of Plaintiff's complaint states a cause of action for retaliation in violation of § 504, such claim having been held to be actionable under the Supreme Court's decision in *Jackson v. Birmingham Bd. of Education*, 544 U.S. 167, 125 S.Ct. 1497, 161 L.Ed.2d 361 (2005)(Title IX and § 504 are "sister" statutes).

127.   Plaintiff engaged in protected expression under § 504 by repeatedly opposing actions by Defendants that Plaintiff reasonably thought violated the anti-discrimination provisions of § 504 and by asserting the rights of the beneficiaries of § 504 to receive a free and

appropriate public education and to be free from unlawful discrimi-
nation by recipients of federal financial assistance.

128.   As a direct and proximate result of her protected ex-
pression under § 504, Plaintiff suffered adverse employment actions,
including, but not limited to:  (1) termination of her employment,
(2) a hostile, intimidating, offensive, and abusive school and work
environment, and (3) other acts which fundamentally changed her
employment relationship with DCSD.

129.   Senior level administrators had actual knowledge of
Plaintiff's protected expression, violations of § 504, and the retalia-
tion against Plaintiff, but failed or refused to take any form of action
to remediate the retaliation or prevent acts of retaliation.

130.   These senior administrators approved, condoned, and
ratified the retaliation against Plaintiff.

131.   The acts of retaliation approved, condoned and ratified
by the senior administrators violated § 504 and were effectively the
official acts of DCSD.

132.   Responsible officials employed by DCSD not only
failed to remediate, but actually participated in the retaliation,
created the hostile environment, and fundamentally altered the
terms and conditions of Plaintiff's employment with DCSD.

133.   Plaintiff should have and recover compensatory damages and other forms of legal relief this court deems appropriate from DCSD for injuries suffered as a result of said  violations of § 504.

134.   Plaintiff should have and recover equitable relief from DCSD, consisting of, among other things, a permanent injunction prohibiting further retaliatory misconduct and retirement or reinstatement to her previous position or "front pay" in lieu of reinstatement, together with such other and further equitable relief this court deems appropriate.

135.   Plaintiff should also have and recover from DCSD reasonable attorneys' fees under 42 U.S.C. § 1988, and 28 U.S.C. § 1920, including, without limitation, filing fees, transcripts, costs related to reproduction of documents, etc.  Plaintiff also seek to recover non-taxable costs, including, without limitation, expert witness fees.

## COUNT II

### RETALIATION UNDER TITLE II OF
### THE AMERICANS WITH DISABILITIES ACT

136.   Plaintiff re-alleges each paragraph enumerated 1 through 135 as if fully set forth at length in this paragraph.

137.   DCSD, a public entity, is subject to the prohibitions of Title II of the Americans with Disabilities Act.

138.   DCSD is not immune under the Eleventh Amendment of the Constitution of the United States from suit in federal court for violation of Title II of the Americans with Disabilities Act.

139.   Because Plaintiff's cause of action is under Title II, they are not subject to nor required to exhaust any administrative remedy.

140.   Plaintiff engaged in protected expression under Title II of the Americans with Disabilities Act by repeatedly opposing actions by Defendants that Plaintiff reasonably thought violated the anti-discrimination provisions of Title II of the Americans with Disabilities Act, and by asserting the rights of disabled students to receive a free and appropriate public education and to be free from unlawful discrimination under Title II of the Americans with Disabilities Act.

141.   As a direct and proximate result of her protected expression under Title II of the Americans with Disabilities Act, Plaintiff suffered adverse employment actions, including, but not limited to: (1) termination of her employment, (2) a hostile, intimidating, offensive, and abusive school and work environment, and (3)

other acts which fundamentally changed her employment relationship with DCSD.

142.   Senior level administrators had actual knowledge of Plaintiff's protected expression, violations of Title II of the Americans with Disabilities Act, and the retaliation against Plaintiff, but failed or refused to take any form of action to remediate the retaliation or prevent acts of retaliation.

143.   These senior administrators approved, condoned, and ratified the retaliation against Plaintiff.

144.   The acts of retaliation approved, condoned and ratified by the senior administrators violated Title II of the Americans with Disabilities Act and were effectively the official acts of DCSD.

145.   Responsible officials employed by DCSD not only failed to remediate, but actually participated in the retaliation, created the hostile environment, and fundamentally altered the terms and conditions of Plaintiff's employment with DCSD.

146.   Plaintiff should have and recover compensatory damages and other forms of legal relief this court deems appropriate from DCSD for injuries suffered as a result of said violations of Title II of the Americans with Disabilities Act.

147.   Plaintiff should have and recover equitable relief from DCSD, consisting of, among other things, a permanent injunction

–39–

prohibiting further retaliatory misconduct and reinstatement to her previous position or "front pay" in lieu of reinstatement, together with such other and further equitable relief this court deems appropriate.

148.    Plaintiff should also have and recover from DCSD reasonable attorneys' fees under 42 U.S.C. § 1988, and 28 U.S.C. § 1920, including, without limitation, filing fees, transcripts, costs related to reproduction of documents, etc.  Plaintiff also seeks to recover nontaxable costs, including, without limitation, expert witness fees.

## Count III

### VIOLATION OF THE GEORGIA WHISTLEBLOWERS ACT
### GA. CODE ANN. § 45-1-4, AS AMENDED

149.    Plaintiff re-alleges each paragraph enumerated 1 through 148 as if fully set forth at length in this paragraph.

150.    DCSD is a Public Employer under GA. CODE ANN. § 45-1-4(4), *as amended*.

151.    Plaintiff are each a Public Employee, as that term is defined under GA. CODE ANN. § 45-1-4(3), *as amended*.

152.    Plaintiff complained to individuals to whom DCSD (a) gave authority to direct and control her work performance; (b) gave authority to take corrective action regarding a violation of or noncompliance with a law, rule, or regulation of which Plaintiff

complained, and (c) designated to received complaints regarding a violation of or noncompliance with a law, rule or regulation.

153.   Plaintiff specifically complained to her supervisors and other senior officials that DCSD violated federal and state law and regulations governing  entities receiving federal funds and prohibiting DCSD from denying disabled school children a free and appropriate public education. The description of federal and state laws and regulations is illustrative, not exhaustive.

154.   DCSD retaliated against Plaintiff in violation of GA. CODE ANN. § 45-1-4(c)(3) by terminating her employment and by taking certain other adverse employment actions affecting the terms or conditions of Plaintiff's employment because Plaintiff disclosed and opposed violations of or noncompliance with federal laws, rules, and regulations to the aforementioned individuals.

155.   Plaintiff has suffered economic and emotional harm for which she is entitled to recover from Defendant.

## COUNT IV
### VIOLATION OF 42 U.S.C. § 1983
### FIRST AMENDMENT

156.   Plaintiff re-alleges each paragraph enumerated 1 through 155 as if fully set forth at length in this paragraph.

157. Plaintiff has a First Amendment right to freedom of speech which right includes academic freedom, to the extent that Plaintiff's speech and academic choices do not create a significant disruption to the educational process of the school.

158. The protected speech asserted in this claim was made by Plaintiff in her capacity as a private citizen and not as an employee of DCSD.

159. To the extent that any of Plaintiff's speech concerned a matter or matters within her official job duties, Plaintiff has a First Amendment right to speech involving academic freedom to the extent Plaintiff's speech does not result in a significant disruption to the educational process of the school.

160. Plaintiff's speech involved classroom discussion that concerned: (a) the education and services DCSD provides to disabled students, which were matters of public interest throughout DeKalb County, the State of Georgia and well beyond the scope of Plaintiff's job duties, (b) opposition to practices made unlawful by federal and state laws and regulations, and (c) conduct that is intimately associated with academic freedom and which in any event involved matters of public interest.

161. Plaintiff's First Amendment right to engage in the speech outweighed the Defendant's interest in prohibiting the

speech in order to promote the efficiency of the public services they perform in that Plaintiff's speech (i) did not impede DCSD's ability to perform its functions efficiently and in a non-discriminatory fashion, (ii) was exercised in an appropriate manner, time, and place, and (iii) was exercised within an appropriate context.

162.   At all times relevant to this action, DCSD had a policy, practice and/or custom of retaliating against individuals who spoke out on matters of public concern.

163.   Plaintiff's speech played a "substantial part" in Defendants' decision to terminate Plaintiff, and Defendant would not have taken the same action absent Plaintiff's protected speech.

164.   As a direct and proximate result of the adverse action by Defendants, Plaintiff has sustained career and financial losses for which she is entitled to recover.

165.   As a direct and proximate result of the retaliation, Plaintiff has sustained mental anguish for which she is entitled to recover.

166.   Plaintiff is entitled to have and recover from DCSD, reasonable attorneys' fees in accordance with the provisions of The Civil Rights Attorney's Fees Awards Act, 42 U.S.C. § 1988, and 28 U.S.C. § 1920, including, without limitation, filing fees, transcripts, costs related to reproduction of documents, etc.  Plaintiff also seeks to recover non-taxable costs, including, without limitation, expert

witness fees.

167.    Plaintiff should have and recover equitable relief from DCSD, consisting of, among other things, a permanent injunction prohibiting further retaliatory misconduct and reinstatement to her previous position or "front pay" in lieu of reinstatement, together with   such other and further equitable relief this court deems appropriate.

## COUNT V

## VIOLATION OF 42 U.S.C. § 1983,

## FOURTH AMENDMENT TO U.S. CONSTITUTION

168.    Plaintiff re-alleges each paragraph enumerated 1 through 167 as if fully set forth at length in this paragraph.

169.    DCSD deprived Keeton of her right to due process of law under the Fourteenth Amendment to the U.S. Constitution by failing to abide by the State of Georgia and its own procedural requirements for notice and right to hearing under the Fair Dismissal Law. GA. CODE ANN. § 20-2-940.

170.    As a result of the foregoing deprivations, plaintiff has been discharged unlawfully from her employment, has suffered post traumatic stress disorder (PTSD), anxiety and other distress, humiliation and embarrassment as a result of being discharged from

employment at DCSD, has suffered and will continue to suffer lost wages and fringe benefits as an employee of DCSD and has suffered other compensatory damages to be proved at trial.

WHEREFORE, Plaintiff demands judgment against the Defendant as follows:

(1)  as to Count I, II, III, IV, and V, compensatory, general and punitive damages in an amount to be proven at trial;

(2)  Under the Seventh Amendment to the United States Constitution and Rule 38, F.R.Civ.P., TRIAL BY JURY on all claims triable to a jury;

(3)  an injunction prohibiting DCSD, its employees, agents, or other affiliated persons from harassing or intimidating Plaintiff;

(4)  reasonable attorney's fees under 42 U.S.C. § 1988;

(5)  such other further and different relief as this Court deems just and appropriate under the circumstances.

Date: <u>October 23, 2014</u>      By: _____

Collette L. Keeton

23 October 2014.               By: /s  Stephen M. Katz
                                    Stephen M. Katz
                                    Ga. Bar No. 409065



THE KATZ LAW GROUP LLC
4799 Olde Towne Parkway
Marietta, Georgia 30068-4350
Telephone:    770.988.8181
Fax:          770.988.8182
EMail:   smkatz@smk-law.com